IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| JOHN B. SPEIGHT, REX ARNEY, ROBIN HURLESS, et al., <br><br>Plaintiffs, <br><br>vs. <br><br>WYOMING GOVERNOR MARK GORDON, in his official capacity, WYOMING REPUBLICAN STATE CENTRAL COMMITTEE, WYOMING REPUBLICAN PARTY CHAIRMAN, and WYOMING REPUBLICAN PARTY, <br><br>Defendants. | Case No. 22-CV-0016-SWS |

## ORDER DENYING PLAINTIFFS' MOTION FOR A TEMPORARY RESTRAINING ORDER

This motion comes before the Court on Plaintiff's *Motion for a Temporary Restraining Order and Preliminary Injunction* (ECF No. 6) and the related complaint (ECF No. 1), both filed on January 25, 2022. Defendants were given notice of the complaint and the motion (ECF No. 8), and Defendant Wyoming Governor Mark Gordon submitted his written response (ECF No. 14), as have Defendants Wyoming Republican State Central Committee and the Republican Party Chairman (ECF No. 20). The Court held a status conference on January 26, 2022 to discuss the temporary restraining order. (ECF No. 10.) Plaintiffs argue they have a likelihood of success on the merits but ignore Supreme Court

1

precedent relevant to their case. Additionally, Plaintiffs have not demonstrated any irreparable harm. Having considered the Plaintiffs' motion and complaint, the Defendants' responses, and Plaintiffs' reply (ECF No. 18), the Court finds the *Motion for a Temporary Restraining Order and Preliminary Injunction* should be DENIED.

## Background

This case arises out of a dispute over filling a statewide elected position vacancy for the remainder of the elected term. On January 16, 2022, State Superintendent of Public Instruction Jillian Balow resigned from her position, leaving the position vacant. (ECF No. 1 at 10.) Pursuant to Wyoming Statute § 22-18-111 (2021), since the vacancy occurred after Balow's second year in office, the Wyoming governor must appoint a successor to fill the position for the remainder of the elected term, which ends January 2023. Wyo. Stat. Ann. § 22-2-105(a)(ii) (2021); Wyo. Const. Art. 4, § 11.

This appointment process is at the heart of the dispute. As a "Major Political Party," the Wyoming Republican Party is governed by Wyoming Statute § 22-4-101, *et seq.*, which gives the Party a proportional number of committeemen and committeewomen. Wyo. Stat. Ann. § 22-4-101(b). The proportional representation is decided by precinct[1] votes—for every 250 votes in a political precinct that go toward the political party, the precinct gets one committeeman and committeewoman. § 22-4-101(c). No political precinct has less than one committeeman and committeewoman, but the precincts may have up to as many committeemen and committeewomen as are proportionate to the votes. *Id.* The

---

[1] Wyoming Statutes define a "precinct" as "an area with established boundaries within a political subdivision used for casting and counting votes." Wyo. Stat. Ann. § 22-1-102(xlvii) (2021).

committeemen and committeewomen from each precinct make up the County Central Committee ("CCC"). § 22-4-101(b). The CCC then elects a county chairman, a state committeeman, and a state committeewoman. Wyo. Stat. Ann. § 22-5-105 (2021); Wyo. Stat. Ann. § 22-4-110 (2021). The elected officials in these positions comprise the State Central Committee ("SCC"). The SCC overall is composed of the three elected representatives of each county along with a state committeeman, a state committeewoman, and a county chairman. § 22-4-110.

This leads to an interesting outcome, where the CCC is proportionate to the precincts and votes within its county, but the SCC for each county is comprised of only three members—the chairman, the committeeman, and the committeewoman—regardless of how many voters (or voters of a certain party) are in the county. *See* § 22-4-110. As a result, each county has equal numbers of representation on the Wyoming Republican Party SCC.

Laramie County, Wyoming, with a population of 100,512, receives the same three representative members as Niobrara County, Wyoming, with a population of only 2,422. However, raw population numbers are not the crux of the analysis—rather the important population for this case is the population of registered Republicans in each county. *See Seergy v. Kings County Republicans County Committee*, 459 F.2d 308, 315 (2d Cir. 1972). As of January 1, 2022, in Niobrara County, there are 1,182 registered Republicans,[2] a total of 0.6% of the total percent of Wyoming registered Republicans. (ECF No. 20-2.) In

---

[2] The Wyoming Secretary of State maintains and publishes a monthly tally of the "Statewide Summary Wyoming Voter Registration" which is available at https://sos.wyo.gov/Elections/Docs/VRStats/2022/22JanVR_Stats.pdf.

contrast, Laramie County has 28,691 registered Republicans, making up 14.62% of the total percent of Wyoming registered Republicans. (*Id.*)

The Wyoming Republican Party SCC is made up of three elected officials from each county,[3] plus the same three elected officials from a national committee, the State Party Chairman and the State Party Vice-Chairman, for a total of seventy-four votes on the SSC. (ECF No. 7 at 8.) While the Wyoming Republican Party bylaws are relatively silent on this process, the bylaws expressly state "[i]n any event, no member of the State Central Committee shall be able to exercise more than one vote." (2020 Bylaws of the Wyoming Republican Party, Art. V § 1, ECF No. 1-1 at 16.) Besides this statement, the bylaws do not require proportional voting, nor do the bylaws give any more specification on the process of filling vacancies for state elected officials. (*See id.*)

In the event of a vacancy in a state elected office past the two-year mark of a four-year term, the Wyoming governor appoints a temporary successor to serve the remainder of the term. § 22-18-111. The governor makes this appointment from a list of three nominees chosen by a SCC vote. § 22-18-11(a)(i). If the elected official represented a political party during their election, the governor may only choose nominees provided by the SCC for that party. (*Id.*) For the Wyoming Republican Party, these nominees are chosen by election through the seventy-four voting members of the SCC. (ECF No. 1 at 10–11.) Once the SCC provides the three nominees to the governor, the governor must make a decision within five days. § 22-18-111(a)(i).

---

[3] There are twenty-three counties in Wyoming. Before accounting for the national committee votes, three votes per county comes to a total of sixty-nine votes.

4

In this case, Superintendent Balow resigned on January 16, 2022. (ECF No. 1 at 10.) The SCC scheduled its vote to designate three nominees to replace the vacant superintendent seat on January 22, 2022. (ECF No. 10 at 11–12.) On January 20, 2022, Plaintiff Tom Lubnau sent a letter to Frank Eathorne, Chairman of the Wyoming Republican Party, and the entire Wyoming Republican Party asking for the scheduled vote to be conducted proportionally by county. (*Id.* at 12.) In this letter, Mr. Lubnau argued the vote was contrary to the Equal Protection Clause in the United States and Wyoming Constitutions. (ECF No. 1-2.) Mr. Lubnau requested the SCC follow the "one man, one vote" principle. (*Id.*)

At the meeting on January 22, Mr. Eathorne declined to conduct a proportional vote because "[t]he Wyoming Republican Party is a private entity, we are not conducting a public election[.]" (ECF No. 1 at 12.) The vote continued as planned, with each member of the SCC submitting one non-weighted vote. (*Id.* at 13.) The results showed Thomas Kelly received sixty-two votes; Marti Halverson received fifty-six votes; Brian Schroeder received fifty-two votes; Megan Degenfelder received nineteen votes; and Plaintiff David Northrup received seven votes. (ECF No. 20-1.) In accordance with § 22-18-111(a), the Committee submitted the list of three nominees (Mr. Kelly, Ms. Halverson, and Mr. Schroeder) to Governor Mark Gordon, who must make his decision on January 27, 2022. (ECF No. 7 at 2 (citing § 22-18-111(a)(i)).

On January 25, 2022, Plaintiffs filed a complaint with this Court, arguing the process violated Wyoming voters' constitutional rights. (ECF No. 1.) In conjunction with this complaint, Plaintiffs also filed a *Motion for a Temporary Restraining Order and a*

5

*Preliminary Injunction* (ECF No. 6) asking this Court to prevent Governor Gordon from selecting a new Superintendent of Public Instruction on January 27, 2022. Plaintiffs argue "Wyoming statutes, as supplemented by Republican State Party Bylaws and as implemented by the party in selecting the three persons for this vacancy, violate their equal protection rights guaranteed by the Fourteenth Amendment to the U.S. Constitution." (ECF No. 7 at 2.) The process for filling vacancies violates the "one man, one vote" principle integral to this country's electoral process. (*Id.*) The vote to select three nominees should have been conducted with each county getting a vote proportional to the number of Republican votes in their county. (*Id.*)

Plaintiffs assert they are not making a facial constitutional challenge to the Wyoming statutes. (ECF No. 7 at 21.) While not explicitly stated, they appear to be challenging the Wyoming statutes, in conjunction with the Wyoming Republican Party bylaws, as applied to plaintiffs.[4] (*See id.*) Specifically, Plaintiffs seem to take issue with the bylaws requiring only one vote per State Central Committee member, arguing this prevents members from following the "one person, one vote" principle articulated in *Baker v. Carr*, 369 U.S. 186, 208 (1962). In other words, this requirement leads to an inequitable outcome where certain counties' votes hold more weight. (ECF No. 1 at 15–16.)

In response, Defendants point to a seminal United States Supreme Court case, *Rodriguez*, to counter Plaintiffs' argument. (ECF No. 14 at 6; ECF No. 19 at 11–12); *Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982). Defendants also argue this

---

[4] Plaintiffs' complaint argues the "matter involves the federal constitutional question of whether the actions of [Defendants] in exercising the authority given to them pursuant to Wyoming Statutes violated the Equal Protection Clause of the U.S. and the equal protection provisions of the Wyoming Constitution." (ECF No. 1 at 6.)

system to fill elected vacancies has been in place for sixty years, but Plaintiffs have only decided to challenge it two days before the Governor needed to appoint a replacement. (ECF No. 19 at 4.) Because of the delay in waiting to file suit over this issue, Plaintiffs cannot show there is irreparable injury—Plaintiffs should have taken up this argument well before the contention over Superintendent Balow's resignation. (ECF No. 19 at 13.) Defendants point out Plaintiffs have not shown the results of the nomination process would be any different under a proportional voting system. (ECF No. 19 at 6–7.) Without concrete and particularized injury, Plaintiffs cannot bring an as-applied challenge to the nomination process. (*Id.* at 7.)

## Legal Standard

The motion before this Court asks for a temporary restraining order and a preliminary injunction. (ECF No. 6.) Because Defendants had an opportunity to submit briefings on the topic, this Court will address the motion as a preliminary injunction. *See Williams v. Bednars*, No. 3:21-CV-00394, 2021 WL 1093111, at *1–2 (N.D. Tex. Mar. 4, 2021) (addressing a "motion for a temporary restraining order and/or a preliminary injunction" through the same analysis when Defendants had notice of the motions). "When addressing a motion for temporary restraining order, the court applies the same standard as it applies to a motion for preliminary injunction." *Rangel-Lopez v. Cox*, 344 F. Supp. 3d 1285, 1289 (D. Kan. 2018). A temporary restraining order (and, by extension, a preliminary injunction) is meant to preserve the status quo before a final decision on the merits. *Resolution Trust Corp. v. Cruce*, 972 F.2d 1195, 1198 (10th Cir. 1992); *see Schrier v. University of Colorado*, 427 F.3d 1253, 1260 (10th Cir. 2005).

> A preliminary injunction has the limited purpose of preserving the relative positions of the parties until a trial on the merits can be held. It is an extraordinary remedy never awarded as of right. A party may be granted a preliminary injunction only when monetary or other traditional legal remedies are inadequate, and the right to relief is clear and unequivocal.
>
> Under Rule 65 of the Federal Rules of Civil Procedure, a party seeking a preliminary injunction must show: (1) the movant is substantially likely to succeed on the merits; (2) the movant will suffer irreparable injury if the injunction is denied; (3) the movant's threatened injury outweighs the injury the opposing party will suffer under the injunction; and (4) the injunction would not be adverse to the public interest.

*DTC Energy Grp., Inc. v. Hirschfeld*, 912 F.3d 1263, 1269–70 (10th Cir. 2018) (internal citations and quotation marks omitted).

The moving party has the burden to demonstrate they are entitled to a preliminary injunction or a temporary restraining order. *Kiowa Indian Tribe of Oklahoma v. Hoover*, 150 F.3d 1163, 1171 (10th Cir. 1998). While it is not necessary that plaintiffs prove their likelihood of success beyond all doubt, plaintiffs must show a reasonable probability they will ultimately be entitled to the relief sought on the merits. *Continental Oil Co. v. Frontier Refining Co.*, 338 F.2d 780, 781 (10th Cir. 1964) (per curiam). They must show more than a mere possibility of success on the merits. *People's Trust Federal Credit Union v. National Credit Union Administration Board*, 350 F.Supp.3d 1129, 1139 (D.N.M. 2018).

## Analysis

**1. Likelihood of Success on the Merits**

The Plaintiffs[5] cite to *Seergy v. Kings County Republican County Committee* as strong support for their likelihood of success. (ECF No. 7 at 9–10.) Additionally, they cite to a United States Supreme Court case, a Tenth Circuit case, and a Wyoming Supreme Court case highlighting the importance of the "one man, one vote" principle. (*Id.* at 11–13 (citing *Marchioro v. Chaney*, 442 U.S. 191 (1979); *Associated Enterprises, Inc. v. Toltec Watershed Imp. Dist.*, 490 P.2d 1069 (Wyo. 1971) (*aff'd* 410 U.S. 743 (1973)); *Semple v. Griswold*, 934 F.3d 1134 (10th Cir. 2019)).

At first blush, *Seergy* appears to mirror Plaintiffs' claims and proposed relief. In that case, Republican voters and members of the Kings County Republican County Committee brought a § 1983 action contesting a recently adopted election law. *Seergy*, 459 F.2d at 309. The committee makeup in New York followed the same makeup as the Wyoming system—each precinct received proportional representation based on the number of Republican votes. *Id.* at 310. However, at the county committee level, each county committee only received two committee members, regardless of the number of Republicans in the county. *Id.* at 311. The new law gave each county committee an equal number of votes, rather than apportioning the votes to correspond with the number of Republican voters in the district. *Id.* Specifically, the law only gave each member of each county committee one vote. *Id.* The plaintiffs argued that violated the "one man, one vote"

---

[5] Defendants contest standing, arguing there is not concrete and particularized injury to Plaintiffs. (ECF No. 19 at 5–6.) While there are sixteen plaintiffs in this matter, the Court does not find it necessary to conduct an in-depth analysis of standing at this time. It appears that one plaintiff was a contender for the nomination at the Jan. 22 meeting (ECF No. 7 at 17) and other plaintiffs are registered Republicans selected to serve on the SCC, who feel their vote is not weighed equally (ECF No. 1 at 2). For the limited purposes of analyzing the *Motion for Temporary Restraining Order and Preliminary Injunction* only, this Court will assume Plaintiffs have standing.

principle because districts with a low number of Republican voters would have greater voting strength compared to districts with a higher number of Republican voters. *Id.* at 310, 312. Importantly, in *Seergy,* the plaintiffs were challenging a newly adopted law that had not yet been utilized by the Republican party. *Id.* at 309–10.

The court first stated political parties, such as the Kings County Republicans, are only required to recognize constitutional protections when adopting "procedures used by a State as an integral part of the election process[.]" *Id.* at 313 (internal citations and quotations omitted). Accordingly, the Second Circuit held the Equal Protections Clause was not violated by the mere passage of the law because in internal affairs of the committee, proportional representation was not required. *Id.* at 313–14. However, "[i]n those rare instances where committeemen perform public electoral functions (e.g. the nomination of candidates to fill vacancies . . .), the county committee is required by the Equal Protection Clause to apply the "one-man, one-vote" principle" because it was a function integral to the election process. *Id.* at 314 (internal quotations omitted).

It should be noted, unlike Wyoming's statutes, whereby the SCC selects three names that are then submitted to the Governor for selection, the New York law simply allowed the committee to select the nominee to fill the vacancy. Elect. Law Art. 6 § 131 (1971). Wyoming's process provides the Governor, who is elected through a popular vote, only three nominees. § 22-18-11(a)(i). The Governor is then tasked with choosing one nominee to appoint to the position. *Id.* Republican voters in Wyoming are represented through the SCC but are also afforded representation in accordance with the Equal Protection clause

10

by electing the Governor. Wyoming's process gives more discretion to a second elected official in the nomination process when compared to the New York statute.

While the composition of the committee is somewhat similar to the case brought before the Court in this matter, that is where the similarity ends. *Seergy* was decided nearly fifty years ago, before the Supreme Court's landmark decision in *Rodriguez*. In *Rodriguez*, the Puerto Rico general legislature authorized a vote, pursuant to Puerto Rico statutes, to fill a vacancy in the Puerto Rico House of Representatives that occurred between elections. *Rodriguez*, 457 U.S. at 3–4. Because the vacant seat had formerly been filled by a democrat, the Popular Democratic Party argued only electors registered as democrats could vote in the special election. *Id.* The Puerto Rico Supreme Court interpreted the election statute to read the Democratic Party could nominate a replacement without the vote within sixty days of the vacancy. *Id.* If no candidate was selected within sixty days, any candidate could run in the special election, regardless of party affiliation. *Id.* at 5. The court was not persuaded this procedure violated the Constitution, because "the Constitution does not expressly require a fixed method for filling vacancies in a state or commonwealth legislature." *Id.* Additionally, the appointment system served a compelling interest by ensuring stability of the legislature between elections. *Id.*

The United States Supreme Court took the issue up on certiorari, to decide whether qualified voters of any party had a federal constitutional right to elect legislative representatives, including representatives who fill a vacancy between general election periods. *Id.* at 6. The Court began by reiterating there was no per se Constitutional guarantee of the right to vote. *San Antonio School Dist. V. Rodriguez*, 411 U.S. 1, 35 n. 78

(1973). Citizens had the right to vote for the legislature during election periods and the interim vacancy appointment policy did not restrict voters from participation in the democratic process. *Id.* at 10. All citizens could exercise their right to vote in general elections and the interim process for vacancies applied uniformly for every political party. *Id.*

Ultimately, the Supreme Court held the Constitution did not prohibit states from filling legislative vacancies through an appointment process. *Id.* at 11. This is especially true when the process does not disproportionately affect any one group of voters, specific candidates, or political parties. *Id.* at 12. The decision in this case created precedent allowing an exception to general voting rights principles when, in special circumstances, it was necessary to fill an elected official's vacancy. Plaintiffs argue *Rodriguez* is not synonymous to the facts here because it did not involve "one man, one vote" (ECF No. 18 at 2) but based on precedent released after *Rodriguez*, this Court disagrees.

Following *Rodriguez*, the United States District Court in Kansas ruled on a situation similar to the one presented by Plaintiffs. In *Gietzen*, after a vacancy in the Kansas State Board of Education, plaintiffs challenged the Kansas statute, which governed filling the vacancy, on Equal Protection grounds. *Gietzen v. McMillon*, 857 F.Supp. 777, 778 (D. Kan. 1994). The Kansas statute allowed an election in the district convention to determine who would be nominated to fill any vacancy in the Kansas State Board of Education. *Id.* The person elected by the district would be appointed by the governor to fill the vacancy for the remainder of the term. *Id.* The person appointed needed to be a member of the same political party as the previously elected official who filled the vacancy. *Id.* The plaintiffs

challenged the statute, arguing the manner by which the district convention elected replacements violated the "one man, one vote" rule. *Id.* at 780.

The district court first determined the statute could be analyzed under a rational basis standard of review, following *Rodriguez*. *Id.* at 782–83. Because the Kansas statute did not affect a suspect class, "it is difficult to understand why a scheme chosen by Kansas to fill such vacancies is subject to heightened scrutiny." *Id.* at 783. The Court next concluded the Kansas statute for filling State Board of Education vacancies survived rational basis. *Id.* The statute had a rational purpose "including expediency and economy in the filling of unexpected vacancies" in the State Board of Education. *Id.* Because "states are entitled to deference in fashioning schemes to fill unexpected vacancies in governmental positions[,]" the statute was constitutional *Id.*; *see also Trinsey v. Commonwealth of Pennsylvania*, 941 F.2d 224, 234 (3d Cir. 1991).

Plaintiffs' arguments ignore the precedent set by *Rodriguez* and followed by *Geitzen*. The Wyoming legislature was well within its Constitutional bounds when it enacted § 22-18-111. Plaintiffs are correct in asserting, generally, whenever a state government decides to select candidates to perform governmental functions via a popular election, the Equal Protections Clause of the Fourteenth Amendment requires each voter have an equal opportunity to participate in that election. *Hadley v. Junior College District*, 397 U.S. 50, 54 (1970). This requires election districts to ensure voters are represented proportionally. *Id.* This precedent has indeed been recognized by both the Tenth Circuit in *Semple v. Griswold* and the Wyoming Supreme Court in *Associated Enterprises*. *Semple*, 934 F.3d at 1136–37; *Associated Enterprises*, 490 P.2d at 1070. In *Semple*, the Tenth

Circuit analyzed "one man, one vote" in the context of amending the state constitution. Similarly distinguishable, *Associated Enterprises* discussed how "one man, one vote" did not apply to the creation of watershed improvement districts.[6] *Associated Enterprises, Inc.*, 490 P.2d at 1070. As Defendants point out, "[n]ot one of the Plaintiffs' cited cases involves state political committees nominating potential successors to a vacant statewide office that will ultimately be filled by gubernatorial appointment." (ECF No. 20 at 4.)

It is clear from past precedent that "one man, one vote" is a respected legal principle when citizens vote in general popular elections. Education is considered "a vital governmental function" and when state or local decisions by a vote affect education, the Equal Protections clause applies. *Hadley*, 397 U.S. at 56. However, this right to vote is not a constitutionally protected right per se and when states adopt laws to fill unexpected vacancies, as opposed to general elections, states have more deference under the Equal Protections clause. *Gietzen*, 857 F.Supp. at 783; *San Antonio School Dist*, 411 U.S. at 35 n. 78. In fact, *Rodriguez* cited Wyoming's statute detailing the appointment process to fill vacancies, noting it was common to fill vacancies without a popular election. *Rodriguez*, 457 U.S. at 5, n. 4. The *Rodriguez* opinion used Wyoming as one example of how common it is for vacancies to be filled through a different process than popular election. *Id.*

The Second Circuit did not have the benefit of the *Rodriguez* decision when it came down with the opinion in *Seergy*, as it was decided ten years earlier. Additionally, the

---

[6] Plaintiffs also cite to *Marchioro v. Chaney* to support the proposition of "one man, one vote" when filling vacancies. (ECF No. 7 at 11.) *Marchioro* does acknowledge interim legislative appointments to fill vacancies should comply with the "one man, one vote" rule, but only briefly in a footnote. *Marchioro*, 442 U.S. at 197, n. 12. The case does not analyze this concept in depth and, similar to *Seergy*, this case was decided before *Rodriguez*.

14

decision in *Seergy* did not actually analyze the implications of the Equal Protections clause for voters when filling a vacancy.[7] The opinion merely discussed how this situation, should it arise, would likely implicate a governmental function sufficient to require constitutional protections. *See Seergy*, 459 F.2d at 314. This is less persuasive than *Gietzen*, which actually analyzed a state statute discussing vacancies of elected positions, similar to Wyo. Stat. § 22-18-111. Second Circuit dicta opining that nominating candidates to fill vacancies would likely implicate the "one man, one vote" principle does not carry the same weight as Tenth Circuit district court precedent specifically analyzing a state vacancy and appointment statute. Other courts have approved an appointment process for filling vacancies, even without complying with "one man, one vote." *Tedards v. Ducey*, 398 F.Supp.3d 529, 548 (D. Ariz. 2019) (*aff'd* 951 F.3d 1041, 1069 (9th Cir. 2020)); *Trinsey*, 941 F.2d at 234–235. Additionally, *Geitzen* is a more recent case which took into account the precedent released since *Seergy*.

---

[7] Notably, the Second Circuit case did not rely on firm precedent when making its decision in *Seergy*.

> In those rare instances where committeemen perform public electoral functions (e.g. the nomination of candidates to fill vacancies or to run in special elections, or the giving or consent to candidacies by non-members of the party), however, the county committee is required by the Equal Protection Clause to apply the "one-man, one-vote" principle, since in such cases it is unquestionably playing an integral part in the state scheme of public elections. *See Maxey v. Washington State Democratic Committee*, 319 F.Supp. 673, 679 (W.D. Wash. 1970).

Seergy, 459 F.2d at 314.

The citation here draws inferences from the *Maxey* case to come to this conclusion. *Maxey* only discussed equal representation when selecting delegates for the presidential elections. *Maxey*, 319 F.Supp. at 674. *Maxey* did not discuss a statute designated to fill vacancies and was also decided prior to *Rodriguez*. The inferential citation to *Maxey* by the court in *Seergy* only further shows there is not any strong precedent supporting the "one man, one vote" principle when filling elected position vacancies.

Not every voting law, even if it may implicate the Equal Protections Clause, is subject to strict scrutiny. *See City of Herriman v. Bell*, 590 F.3d 1176, 1184 (10th Cir. 2010). "To subject every voting regulation to strict scrutiny and to require that the regulation be narrowly tailored to advance a compelling state interest . . . would tie the hands of states seeking to assure that elections are operated equitably and efficiently." *Burdick v. Takushi*, 504 U.S. 428, 433 (1992). Although every election statutory scheme will affect voter rights in some way, when the State is furthering "important regulatory interests" there is justification for "reasonable, nondiscriminatory restrictions" on voting. *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983). There is also no evidence Wyoming's statute or the Republican Party bylaws affect a suspect class. Accordingly, this Court follows *Gietzen* and analyzes the Wyoming law using rational basis review. *Gietzen*, 857 F.Supp. at 783; *see also Tedards*, 398 F.Supp.3d at 538; *Trinsey*, 941 F.2d at 234.

The rational basis standard of review only requires "that the means be rationally related to a conceivable and legitimate state end." *Petrella v. Brownback*, 980 F.Supp.2d 1293, 1304 (D. Kan. 2013) (citing *Nguyen v. INS*, 533 U.S. 53, 77 (2001)). Wyo. Stat. § 22-18-111 sprouts from the Wyoming State Constitution. "When any office from any cause becomes vacant, and no mode is provided by the constitution or law for filling such vacancy, the governor shall have the power to fill the same by appointment." Wyo. Const. Art. 4, § 7. Following the state constitution is a legitimate state interest. *See Quilter v. Voinovich*, 981 F.Supp. 1032, 1051 (N.D. Ohio 1997). Additionally, this statute promotes efficiency by preventing gaps in state elected positions after an unexpected vacancy. *See Gietzen*, 857 F.Supp. at 783. These reasons withstand a rational basis review.

Additionally, the Wyoming Republican Party bylaws state every committee member is only allowed one vote. (ECF No. 1-1 at 16.) While Plaintiffs feel this allows disproportionate representation, there is certainly a rational basis for this rule. If committee members were allowed more than one vote, there may be disproportionate elections or jilted voting systems. Certainly, this bylaw could be amended to include proportional voting by county population, but there is a rational basis for enacting and abiding with this bylaw as written.

Requiring proportional votes based on county population may be a more equitable way to conduct elections within the SCC, but the failure to conduct votes and abide by the "one person, one vote" principle is not a violation of Equal Protection. The Wyoming Legislature is afforded more deference in determining how to fill elected office vacancies. If voters feel their vote is diluted and are unhappy with the Governor's appointment (or the three nominees submitted to the Governor), voters have the opportunity to cast a ballot in the next general election, when their votes are counted in compliance with "one man, one vote."

Consequently, Plaintiffs are unable to prove their case would likely succeed on its merits. When Plaintiffs cannot satisfy this first factor, a court is not required to analyze the remaining factors for a preliminary injunction. *See Nova Health Systems v. Edmondson*, 460 F.3d 1295, 1299 (10th Cir. 2006) (affirming a district court's denial of a preliminary injunction because plaintiff failed to show likelihood of success on the merits, without analyzing the remaining three factors). However, it is worth mentioning that Plaintiffs do not show any irreparable harm. "[T]he showing of probable irreparable harm is the single

most important prerequisite for the issuance of a preliminary injunction." *Schrier*, 427 F.3d at 1268 (internal citations omitted).

Plaintiffs argue "[t]he impact on the rights of plaintiffs is difficult to overstate." (ECF No. 7 at 20.) One of the plaintiffs, Mr. Northrup, could have been a nominee if the Wyoming Republican Party used a proportional voting system, but as an unsuccessful candidate, he was deprived of Equal Protection. (*Id.*) Additionally, "[i]mportant constitutional rights will be forever lost once the Governor fills the vacant office[.]" This argument does not include any cites to case law (or any authority) to support the conclusory allegation. Plaintiffs do not elaborate why the Governor could not simply rescind the appointment. Additionally, Plaintiffs do not give any reasons why the SCC could not conduct a new vote. Most importantly, Plaintiffs do not provide any information that their choice candidates would have been selected if the SCC vote had complied with "one man, one vote." At most, Plaintiffs state "plaintiff Northrup *could well have been* one of the nominees if a vote following one-man, one-vote principles had been used." (ECF No. 7 at 20) (emphasis added). "Could well have been" is not sufficient to show irreparable harm. Plaintiffs' argument is further diminished by the tally sheet. (ECF 20-1.) Northrup received only seven votes. (*Id.*) Comparatively, the three winning nominees received sixty-two, fifty-six, and fifty-two votes respectively. (*Id.*) Plaintiffs do not provide any information on how the voting system would change if votes were proportional, specifically, how many votes each county "should" have under a proportional system.

Furthermore, irreparable harm seems unlikely because all Wyoming voters will have an opportunity to elect a new Superintendent of Public Instruction in November

18

2022—the Governor's appointment only fills the position for the next nine months. *See Tedards*, 398 F.Supp.3d at 547 (denying injunctive relief because plaintiffs could not show a twenty-nine month senate appointment to fill a vacancy would result in irreparable injury). Because Plaintiffs cannot show a likelihood of irreparable harm, they have failed to satisfy the second factor required to justify a preliminary injunction or a temporary restraining order.

## Conclusion

Plaintiffs cannot demonstrate a likelihood of success on the merits because the case law does not support their position. Additionally, Plaintiffs have failed to establish irreparable injury. Because Plaintiffs cannot satisfy two of the four factors used to evaluate a preliminary injunction and a temporary restraining order, they have failed to meet their burden of proof. Thus, it is hereby

ORDERED that Plaintiffs' *Motion for a Temporary Restraining Order and Preliminary Injunction* (ECF No. 6) is DENIED.

Dated this 27th day of January, 2022.

Scott W. Skavdahl
United States District Judge